COURT OF APPEALS
DECISION
DATED AND FILED

January 18, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1207**

**STATE OF WISCONSIN**

Cir. Ct. No. 2021ME204

**IN COURT OF APPEALS
DISTRICT II**

IN THE MATTER OF THE MENTAL COMMITMENT OF G.M.M.:

WAUKESHA COUNTY,

PETITIONER-RESPONDENT,

V.

G.M.M.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Waukesha County: MARIA S. LAZAR, Judge. *Affirmed*.

¶1 NEUBAUER, J.[1] G.M.M. appeals from orders extending her commitment under WIS. STAT. ch. 51 for twelve months and permitting involuntary administration of medication and treatment during that time. G.M.M. argues the orders should be reversed for three reasons: (1) Waukesha County failed to prove that she is mentally ill; (2) the County failed to prove that she is dangerous; and (3) the circuit court failed to make the findings required under *Langlade County v. D.J.W.*, 2020 WI 41, ¶59, 391 Wis. 2d 231, 942 N.W.2d 277. This court concludes that G.M.M.'s arguments are unavailing and affirms the orders.

## BACKGROUND

¶2 A brief discussion of the legal framework governing involuntary commitment in Wisconsin will focus and contextualize our discussion of the facts. Wisconsin law permits a person to be committed involuntarily if the petitioner proves by clear and convincing evidence that the person is: "(1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to themselves or others." *D.J.W.*, 391 Wis. 2d 231, ¶29. The petitioner must prove the same three elements by clear and convincing evidence each time it seeks to extend a commitment. *Id.*, ¶31.

¶3 WISCONSIN STAT. ch. 51 sets forth what a petitioner must show to satisfy these elements. For the purpose of involuntary commitment, a person is deemed to have a "[m]ental illness" if he or she has "a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

demands of life." WIS. STAT. § 51.01(13)(b).[2] WISCONSIN STAT. ch. 51 also provides five standards for proving dangerousness. WIS. STAT. § 51.20(1)(a) 2.a.-e. At issue in this case is the third standard, which requires proof that an individual:

> Evidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals. The probability of physical impairment or injury is not substantial under this subd. 2.c. if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services[.]

Sec. 51.20(1)(a)2.c.

¶4      An individual who is receiving treatment at the time an extension is sought may not have exhibited any recent acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior. Thus, in the context of a recommitment,[3] the petitioner may instead show that there is a substantial likelihood of dangerousness should treatment lapse. *Portage County v. J.W.K.*, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509. Accordingly, dangerousness in extension proceedings "may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." WIS. STAT. § 51.20(1)(am).

---

[2] Alcoholism is specifically exempted from the definition of "[m]ental illness" in WIS. STAT. § 51.01(13)(b), but no party contends that condition is at issue in this case.

[3] "[R]ecommitment" is synonymous with "extension of a commitment," and the terms will therefore be used interchangeably. *See Sheboygan County v. M.W.*, 2022 WI 40, ¶6 n.3, 402 Wis. 2d 1, 974 N.W.2d 733.

¶5     If the County relies on WIS. STAT. § 51.20(1)(am) to prove dangerousness, a link to one of the five dangerousness standards in § 51.20(1)(a)2. is required. *See **D.J.W.***, 391 Wis. 2d 231, ¶¶32-34. Moreover, "[i]t is not enough that the individual was at one point a proper subject for commitment." ***J.W.K.***, 386 Wis. 2d 672, ¶24. "Each extension hearing requires proof of *current* dangerousness." ***Id.*** With these legal standards in mind, this court turns to the facts.

¶6     In early May 2021, law enforcement responded five times to the home G.M.M. shares with one of her sisters in response to reports that G.M.M. had expressed delusional and paranoid thoughts, yelled and caused repeated disturbances, and eventually became physically aggressive towards her sister. A responding officer spoke with G.M.M.'s sisters and learned that she had been dealing with untreated mental illness for more than a decade. Her sisters believed that she is schizophrenic because her symptoms were similar to those of one of her sisters who had been diagnosed with that condition. They described G.M.M. as "no longer ha[ving] a connection with reality" and "a completely different person."

¶7     G.M.M. was emergently detained in May 2021 and a probable cause hearing was held at which a court commissioner found sufficient grounds to continue her detention until a final hearing. A subsequent filing in the case detailed the incidents and behavior that led to her detention:

> [G.M.M.] was placed under a Chapter 51 Emergency Detention on 05/2/21 after becoming violent with her sister, with whom she lives. It was reported that the day prior, May 1, 2021, officers responded to her residence 5 times due to her yelling and causing a disturbance. She believed that the birds outside of her window were there to kill her and were talking about her. She also made reference that her sister was not actually her sister, but someone wearing

a mask to look like her sister that works for the Iranian government, and who tortured and killed her real family. Family indicated that for the past 2 days [G.M.M.] became increasingly more loud, fearful of others, and making irrational statements. On 5/2/21, she became aggressive with her sister [T.V.G.], as she believed [T.V.G.] was on the phone talking about her. [G.M.M.] threw a remote at the wall, slammed doors, and pulled the phone out of [T.V.G.]'s hand while she was talking to their brother, causing the phone receiver to hit her in the right cheek. Police described [G.M.M.] as irrational and making incoherent statements. She indicated that radio waves were coming to her through the TV, was paranoid about the officers jurisdiction, stating she only wants to talk with the FBI, and making reference several times that the officers were not real and discussing a 50 year conspiracy of people wearing masks and pretending to be people they were not. It was reported that she had not left her home in 2 years due to her fear of germs, and believing that she had a chronic illness, which is untrue. She believed that she had infections resulting in her having cysts all over her body and brain and that she bleeds internally, and that if she went outside she would die. The family reported that they would observe her screaming out the window at people who were not there, talking to herself, and that she has ideas of reference that people outside are talking about her. Additionally, she stopped attending medical appointments 2 years ago due to her fear that people were talking about her outside.

¶8      The circuit court appointed two doctors who examined G.M.M. and filed reports before the final hearing. At the hearing, counsel for the County summarized the reports and the incidents that led to G.M.M.'s detention. G.M.M.'s counsel waived her appearance and informed the court that G.M.M. did not object to "a six-month commitment with the medications order." Based on the lack of objection, the materials in the record, and the statements of counsel, the circuit court found the three elements for commitment were met and entered orders committing G.M.M. for six months and allowing involuntary medication and treatment. G.M.M. returned to her sister's home ten days later and began receiving outpatient treatment.

¶9 Towards the end of the six-month period, the County filed a petition to extend G.M.M.'s commitment and medication orders for another twelve months. The circuit court appointed Dr. Cary Kohlenberg and Dr. Robert VerWert to examine G.M.M. and submit reports on her mental health condition. Both doctors concluded that G.M.M. continued to meet the requirements for involuntary commitment.

¶10 The circuit court held a hearing on the County's extension petition on November 2, 2021. G.M.M. contested the extension but again waived her appearance. The County presented testimony from Dr. VerWert and Danielle Weber, a clinical therapist and court monitor for the Waukesha County Department of Health and Human Services.

¶11 VerWert, a licensed psychologist, spoke with G.M.M. by phone for about an hour a week before the hearing, talked to her sister, and reviewed the County's report supporting the extension request as well as other records. He testified regarding each of the three elements for commitments under WIS. STAT. ch. 51. First, VerWert stated that G.M.M. suffers from schizophrenia and described some of the delusions that had precipitated her initial confinement. He also described some of the delusional thinking G.M.M. had displayed during their phone call:

> Well, she pretty much admits that she has her reality and that the things that she's expressed in these delusions are her reality and that others are trying to change that. Therefore, they are harassing her. She's pretty insistent that this was her reality and she has the right to have those delusions. So when I would ask about the TV, there were indeed voices or sounds coming from the TV aimed at her. She made some strange comment about these were word associations. They're still there, but they're more manageable now.

VerWert admitted that G.M.M. had not vocalized thoughts about wanting to kill herself or harm her sister. But in light of the delusions she did express, VerWert agreed that G.M.M.'s condition is a substantial disorder of thought and mood that grossly impairs "her judgment, behavior, capacity to recognize reality" and "ability to participate" in ordinary life. He also relayed that G.M.M. had "denied having any mental illness or need for medication," and testified that she lacks insight.

¶12 Next, VerWert confirmed that G.M.M. is a proper subject for treatment. He acknowledged that G.M.M. needed medication to treat her condition and that medication improves but does not eliminate her symptoms. He did not believe that she would take medication if not compelled to do so because she had previously indicated that she believed it was causing other health problems and because she "still doesn't think she has a mental illness."

¶13 Lastly, when asked whether he believed G.M.M. would become a proper subject for commitment if treatment were withdrawn, VerWert said "yes" and cited her precommitment aggression and his concern that her family, who were providing "everything—food, clothing, [and a] place to live," might not be able to continue caring for her if she stopped taking medication. VerWert also expanded on his opinion that G.M.M. presented "a substantial probability of physical impairment or injury to [herself] or others due to impaired judgment" by explaining that her delusions "get in the way of making any proper judgments at all" and by citing her yelling and aggressive behavior towards her sister that precipitated her initial commitment. VerWert also testified that he explained to G.M.M. the advantages and disadvantages of, and alternatives to, her medication but agreed in response to questions from the County's counsel that she is not capable of expressing an understanding of accepting treatment or of "applying the

7

advantages, disadvantages, and alternatives in order to make an informed choice about whether to accept" medication.

¶14     The other witness, Ms. Weber, testified about the extension report, which summarized the care and treatment G.M.M. had received since her initial commitment.  When asked to describe G.M.M.'s level of compliance since she was committed, Weber testified that G.M.M.

> has attended her appointments, but she has made it known that she is only compliant due to her court order.  She presents because she is court-ordered to attend and court-ordered to take medications.  She has expressed that she doesn't feel she needs medication and holds paranoid beliefs that the medications are causing heart arrhythmias and low blood pressure and that she doesn't want to take the medications.

Like VerWert, Weber expressed her belief that G.M.M. will not "remain medication compliant without the court order" and is concerned "that she would become aggressive at the home again with her siblings."

¶15     The circuit court also received the County's report in evidence, which further described G.M.M.'s condition since the initial commitment:

> Following her 2nd injection of Invega Sustenna, [G.M.M.] became less somatically focused and was able to come out of her room more frequently at the Mental Health Center. She continued to express some paranoid delusions, such as that she was in danger of bleeding in her brain due to a tonsillectomy that she received in the 9th grade, and she would not sign any papers, believing that she had a lack of oxygen in her brain due to heart arrhythmias. She returned to her sister's home on 5/21/21 and was referred to outpatient care and treatment at the Department. She has met with her outpatient prescriber on 3 occasions since her discharge to outpatient care and treatment. Throughout her outpatient treatment, she has consistently displayed poor insight into her disorder and need for medications, indicating that the altercation with her sister was all a misunderstanding, and she has continued to express

8

delusional beliefs that she will contract infections from going outside. She has expressed to her treatment team that her commitment was result of a misunderstanding with her family, and that the only reason she is presenting for appointments to receive her long-acting injection is because she is court ordered to do so. [G.M.M.] reported that she does not feel she needs an injection and indicates that it is interfering with a cardiac condition. She later indicated that she has not seen a cardiologist in at least 2-3 years and has no basis for her belief that her long-acting injection would be affecting a possible cardiac condition. She has also expressed concern that her injections are causing her to experience low blood pressure, however her blood pressure is always within normal range when she presents for her appointments. Ms. Mercy Mahaga, APNP has opined that [G.M.M.] lacks insight into her disorder and need for treatment, and that without a commitment and involuntary medications order, [she] would stop treatment and decompensate. She continues to be treated with a long-acting injection, due to her lack of insight and need for medication.

¶16    The circuit court concluded that the County had met its burden of proof with regard to an extension of G.M.M.'s commitment, citing the testimony and other evidence concerning her delusions, prior aggressive behavior, lack of insight, and concern about the possibility she would injure others in the future. The court concluded that the County had proven dangerousness under WIS. STAT. § 51.20(1)(am), which linked to the third standard for dangerousness, § 51.20(1)(a)2.c. Based upon these conclusions, the court ordered that G.M.M.'s commitment and medication orders be extended by twelve months.

## DISCUSSION

¶17    This court's review of the circuit court's decision presents a mixed question of law and fact. *D.J.W.*, 391 Wis. 2d 231, ¶24. We will uphold a circuit court's findings of fact unless they are clearly erroneous, but whether the facts satisfy the statutory requirements for recommitment is a question of law that we review independently. *Id.*, ¶¶24-25.

9

*Mental Illness*

¶18 G.M.M. first contends that the County did not establish by clear and convincing evidence that she is mentally ill. She argues that VerWert, the County's principal witness on this issue, did not have sufficient information to diagnose her with schizophrenia because he relied only on the County's report and his conversations with G.M.M. and her sister. She faults VerWert for not "properly" assessing her according to the criteria in the Diagnostic and Statistical Manual (DSM)[4] and cites the lack of any other doctor's assessment of her medical condition in the record.

¶19 These criticisms are not enough to show that the County failed to carry its burden. Whether a person has a mental illness under WIS. STAT. ch. 51 does not turn on whether the person satisfies the criteria for a particular mental disorder set forth in the DSM. Our supreme court has explained that the definition of "mental illness" in WIS. STAT. ch. 51 "serve[s] a legal, not medical, function," *State v. Post*, 197 Wis. 2d 279, 305, 541 N.W.2d 115 (1995), and G.M.M. cites no legal authority for the proposition that the County must present evidence that an individual satisfies the diagnostic criteria listed in the DSM for a specific disorder to show the individual is "mentally ill" under WIS. STAT. § 51.20(1)(a)1.

¶20 Under Wisconsin law, the term "[m]ental illness" is defined in relevant part as "a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life." WIS. STAT.

---

[4] The DSM, currently in its fifth edition, is "the primary tool of clinical diagnosis in the psychiatric field." *State v. Post*, 197 Wis. 2d 279, 305, 541 N.W.2d 115 (1995).

§ 51.01(13)(b). VerWert testified that G.M.M. met both criteria embedded in this definition, and sufficient information in the record supports his conclusions.

¶21 VerWert identified G.M.M.'s mental illness as schizophrenia, a substantial disorder of thought "that causes her moods to be very anxious and depressed as well." Before testifying, VerWert spoke with G.M.M. and the sister with whom she lived and reviewed the County's report in support of its extension request and unspecified "collateral records" and "information." It is apparent that he also drew on his expertise as a licensed psychologist (to which G.M.M. stipulated) and his prior experience with persons with schizophrenia.[5] In addition, VerWert testified that he "certainly looked" at the DSM and emphasized that G.M.M.'s delusional thoughts were one of the manual's criteria for schizophrenia.

¶22 VerWert explained that G.M.M.'s thoughts are substantially disordered because she has delusions that make her think she is in physical danger and that her family members are not who they appear to be. He explained that these delusional thoughts "cause[] her moods to be very anxious and depressed as well." Some of these delusions occurred before G.M.M.'s initial commitment, but VerWert also testified that she continued to express them during his evaluation, which occurred months after her initial commitment began. The County's report in support of recommitment also stated that G.M.M. "continued to express some paranoid delusions" about threats to her physical health after she began receiving medication.

---

[5] VerWert confirmed that these sources of information are commonly relied upon by persons in his field.

¶23　VerWert also confirmed, in response to the County's questions, that G.M.M.'s disorder grossly impaired her judgment, behavior, and ability to recognize reality, and "participate in the ordinary affairs of life."[6]　He explained that G.M.M.'s delusional thinking that "her real[i]ty is hers and she has the right to it" causes her to lack insight into her mental illness, which in turn prevents her from exercising sound judgment about whether she needs medication.　The County's report provides additional evidence of impairment, noting that G.M.M. "has continued to express delusional beliefs that she will contract infections from going outside."　Finally, VerWert noted in his report that her family continues to provide her housing, food, and clothing because she is unable to "hold down a job … or to maintain her own apartment."

¶24　No Wisconsin law to which G.M.M. has directed this court required VerWert to consult other diagnoses, review G.M.M.'s medical records, or perform a full diagnostic evaluation consistent with the DSM before determining that her condition meets the definition of "mental illness" under WIS. STAT. ch. 51.　Nor does the fact that VerWert responded in the affirmative to questions phrased in the words of the definition of that statutory term render his opinions insufficient.　That pattern of questions and answers is the nature of these types of cases and serves an important purpose:　ensuring, by reference to the statutory language, that an individual is not committed unlawfully.　*See* ***Outagamie County v. Melanie L.***, 2013 WI 67, ¶91, 349 Wis. 2d 148, 833 N.W.2d 607 (reversing commitment order where expert did not use statutory terminology).　This court is convinced from VerWert's testimony that he did not merely parrot the statutory definition, but

---

[6] VerWert confirmed that he held these opinions to a reasonable degree of medical certainty.

12

rather that his opinion regarding G.M.M.'s mental illness was grounded in the facts.

*Dangerousness*

¶25     G.M.M. next argues that the County did not meet its burden of proof with respect to the element of dangerousness.  As she notes, the County sought to establish dangerousness under the third standard, WIS. STAT. § 51.20(1)(a)2.c., and the recommitment standard, § 51.20(1)(am).  "Under those two provisions, the County's burden was to show a substantial likelihood, based on [G.M.M.'s] treatment history, that if treatment were withdrawn [s]he would again face 'a substantial probability of physical impairment or injury to [herself or other individuals]' and that there is either no 'reasonable provision for [her] protection ... available in the community' or that [G.M.M.] would not, to a 'reasonable probability,' 'avail [herself] ... of these services.'"  *See Sauk County v. S.A.M.*, 2022 WI 46, ¶32, 402 Wis. 2d 379, 975 N.W.2d 162 (omissions in original; quoting § 51.20(1)(a)2.c., (1)(am)).  G.M.M. challenges the County's evidence on three specific grounds.

¶26     First, she contends VerWert "improperly equated delusional behavior with dangerousness" and analogizes her case to a recent unpublished, but authored, decision of this court, *Winnebago County v. L.F.-G.*, No. 2019AP2010, unpublished slip op. (WI App May 20, 2020).[7]  There, this court reversed a recommitment order after concluding that the testifying doctor did not establish

---

[7] Though unpublished, *Winnebago County v. L.F.-G.*, No. 2019AP2010, unpublished slip op. (WI App May 20, 2020), may be cited for persuasive value.  *See* WIS. STAT. RULE 809.23(3)(b).

that L.F.-G. was dangerous. *Id.*, ¶5. Specifically, we determined that the doctor had established that L.F.-G. "would be a proper subject for *treatment*" if her treatment stopped, but had not shown how returning to her pre-commitment "'acutely psychotic' state would impact her behavior such that there is a substantial likelihood that she would be *currently* dangerous … if treatment was withdrawn." *Id.*, ¶7.

¶27 The present case is materially distinguishable from *L.F.-G.* VerWert's testimony and other evidence established what was missing in *L.F.-G.*—a substantial likelihood that G.M.M. would engage in behavior that posed a danger to herself or others if treatment were withdrawn. VerWert did not merely opine that G.M.M. would be dangerous if treatment were withdrawn because she would experience delusional thoughts. Instead, he connected those thoughts to past *behavior* that posed a threat of physical harm to her sister. His report and the County's report recount how G.M.M.'s delusional thoughts led her to act in an increasingly erratic, disruptive, and ultimately aggressive manner in the days leading up to her initial commitment. Reliance on this past behavior was appropriate. *See Winnebago County v. S.H.*, 2020 WI App 46, ¶13, 393 Wis. 2d 511, 947 N.W.2d 761 ("Dangerousness in an extension proceeding can and often must be based on the individual's precommitment behavior, coupled with an expert's informed opinions and predictions[.]").

¶28 VerWert also provided evidence about G.M.M.'s current status and potential to again become physically aggressive if she stopped receiving medication. He testified that G.M.M. "still doesn't think she has a mental illness," and his report indicates that G.M.M. told him that the medication she was receiving was not helpful and was in fact harming her. He also repeatedly referenced a concern voiced by G.M.M.'s sister that her aggressive behavior

would return and prevent her family from continuing to care for her. The County's other witness, Weber, testified that G.M.M. likely would not continue to take medication without a court order and expressed a similar concern "that she would become aggressive at the home again with her siblings" if she stopped taking medication. In discussing both what occurred before G.M.M. began involuntary medication and what might occur if it were to stop, the witnesses went beyond equating dangerousness to the mere existence of delusional thought and explained that the delusions had, and likely would, lead to behavior that posed "a substantial probability of physical impairment or injury to [G.M.M.] or other individuals. *See* WIS. STAT. § 51.20(1)(a)2.c.

¶29 Next, G.M.M. argues that the County did not present evidence that support is unavailable to G.M.M. in the community. Under *S.A.M.*, the County must show *either* that reasonable provision for the individual's protection is not available in the community *or* that it is not reasonably probable that the individual will take advantage of such services. *S.A.M.*, 402 Wis. 2d 379, ¶32. The evidence sufficiently establishes the latter point. VerWert testified that G.M.M. does not think she has a mental illness and would not voluntarily take medication. Weber likewise testified that G.M.M. "has made it known that she is only compliant due to her court order," that she continues to experience delusions, and that she would not "remain medication compliant without the court order." G.M.M. did not dispute either witness on these points. The factfinder could reasonably infer from this evidence a reasonable probability that if protective measures were available to G.M.M. in the community, she would not avail herself of them.

¶30 G.M.M.'s third argument is that the County improperly relied on her supposed "lack of insight" into her mental illness as a reason to find her dangerous. She argues that an individual's lack of insight into his or her mental

15

illness and need for treatment is "not nearly enough" to establish dangerousness. This is correct, so far as it goes. The evidence presented by the County, however, went beyond showing that G.M.M. does not recognize that she has a mental illness and needs medication to treat its symptoms. As recounted above, the testimony and reports sufficiently proved that G.M.M. is dangerous under the third standard via the WIS. STAT. § 51.20(1)(am) recommitment alternative.

*Findings Required by **D.J.W.***

¶31 Lastly, G.M.M. contends that the circuit court did not make the factual findings required under ***D.J.W.*** In that case, our supreme court directed "circuit courts in recommitment proceedings … to make specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. on which the recommitment is based." ***D.J.W.***, 391 Wis. 2d 231, ¶3. The court imposed this requirement to "provide[] clarity and extra protection to patients regarding the underlying basis for a recommitment" and "clarify issues raised on appeal of recommitment orders and ensure the soundness of judicial decision making." *Id.*, ¶¶42, 44.

¶32 Here, the proceedings in the circuit court satisfied the purposes underlying the ***D.J.W.*** directive. In its recommitment petition, the County sought to extend G.M.M.'s commitment under the recommitment alternative, § 51.20(1)(am). VerWert testified as to the elements for commitment under the third standard and § 51.20(1)(am), and the County cited those standards in its closing argument. G.M.M. therefore knew which dangerousness standard the County sought to extend her commitment under. In addition, the circuit court found G.M.M. to be mentally ill, a proper subject for treatment, and dangerous under the third standard and, as detailed above, explained the factual basis for its

findings.[8] The parties knew which statutory standards were being applied, and the court's ruling informs this court which standard it applied and its reasons for doing so.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[8] The County also invoked the fourth standard for dangerousness, WIS. STAT. § 51.20(1)(a)2.d., but the circuit court did not find that standard applicable.